IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NORFOLK SOUTHERN RAILWAY COMPANY | : | No. 3: 03 cv 0736 |
| Plaintiff | : | |
| | : | (Judge Munley) |
| v. | : | |
| | : | |
| READING BLUE MOUNTAIN & NORTHERN RAILROAD COMPANY | : | |
| | : | |
| Defendant | : | |

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION OF READING BLUE MOUNTAIN & NORTHERN RAILROAD COMPANY
TO DISQUALIFY JANSSEN & KEENAN, P.C. AS COUNSEL
FOR NORFOLK SOUTHERN RAILWAY COMPANY**

Defendant Reading Blue Mountain & Northern Railroad Company ("Reading Blue Mountain") submits this Memorandum in support of its motion to disqualify Janssen & Keenan, P.C. ("J&K") from continuing to represent plaintiff Norfolk Southern Railway Company ("Norfolk Southern") in this action. The motion is based on J&K negotiating with, and ultimately hiring, Charles Howard who was a significant member of Reading Blue Mountain's defense team in this action until he left to join J&K.

**I.      Relevant Procedural Background.**

Norfolk Southern filed this lawsuit against Reading Blue Mountain on April 30, 2003, alleging that Reading Blue Mountain breached an agreement (the "Agreement") it had entered

into in August of 1996 with Consolidated Rail Corporation ("Conrail"). The Agreement related to the maintenance of a common communication and signal system that served adjacent tracks owned by Reading Blue Mountain and Norfolk Southern (as the successor to Conrail). Norfolk Southern's lawsuit sought payments for past maintenance, emergency repairs to the pole line system that was destroyed by a storm in December, 2002, and the costs of a permanent upgraded system. Reading Blue Mountain answered the complaint, and raised affirmative defenses and counterclaims.

After discovery was completed, Reading Blue Mountain filed a Motion for Partial Summary Judgment. After Norfolk Southern responded, and argument before the Court, the Court granted Reading Blue Mountain's Motion and ordered:

> 1) Plaintiff Norfolk Southern Railway Company's claims arising from permanent upgrades to the shared communications system are hereby **DISMISSED**, and
>
> 2) it is **DECLARED** that the purpose of the C&S Common Facilities Maintenance Agreement was frustrated following damage to the communications system on December 25-26, 2002, and that the parties' duties to render performance under the Agreement are **DISCHARGED**.

Order of the Court entered December 2, 2004.

On December 16, 2004, Norfolk Southern filed a Motion for Reconsideration. Reading Blue Mountain filed its response on December 30, 2004, and Norfolk Southern replied on January 12, 2005. The Court has not ruled on the Motion for Reconsideration, and no trial date has been set.

## II. Factual Background.

Since this case began over two years ago, Norfolk Southern has been represented by J&K, and reading Blue Mountain has been represented by Gollatz, Griffin & Ewing, P.C. ("GGE").

2

Although Reading Blue Mountain has not been advised of all of the details or timing, it understands that at some time prior to May 26, 2005, J&K advised Charles Howard, an attorney at GGE working on the case, that J&K had an opening for a transportation litigator. Subsequently, J&K entered into employment negotiations with Mr. Howard while he remained counsel of record for Reading Blue Mountain. Neither GGE as Mr. Howard's then current employer, nor Reading Blue Mountain, had any notice of the negotiations until May 26 when GGE was informed that Mr. Howard had accepted an offer of employment with J&K.

Mr. Howard was a critical member of the GGE defense team in this action. He had been involved in the representation of Reading Blue Mountain since the original complaint was filed in April 2003. Mr. Howard was an active participant in all aspects of Reading Blue Mountain's defense. He discussed confidential issues and strategic issues with the President of Reading Blue Mountain on this case, as well as other matters related to Reading Blue Mountain and Norfolk Southern. He was involved in trial strategy decisions; he interviewed Reading Blue Mountain employees; and he took or defended all of the depositions that were conducted during the discovery phase. He was the lawyer at GGE with the best command of the entire record of the case. In December 2004, Mr. Howard successfully argued Reading Blue Mountain's Motion for Partial Summary Judgment. He spent substantially more time on the defense of this case than any other lawyer at GGE.

The negotiations between J&K and Mr. Howard, and the ultimate employment of Mr. Howard, took place while this case remained open. The parties are waiting for the Court's decision on Norfolk Southern's motion for reconsideration of the partial summary judgment that has been granted to Reading Blue Mountain, and ultimately there will need to be a trial on the remaining issues in the case. Reading Blue Mountain faces not only the time and money that

will be required to bring a new lawyer up to speed, but the daunting task of having to replace the member of its defense team with the most knowledge of the case, and the one who had the opportunity to evaluate all of the potential witnesses that were deposed. If J&K is permitted to continue in this case, Norfolk Southern will face no such obstacles.

J&K has proposed screening Mr. Howard from involvement in this case (as well as certain other matters). However, the screening was not proposed until after J&K and Mr. Howard had negotiated and reached agreement on employment. Further, because J&K is a small firm (nine lawyers in a single office), with only five lawyers practicing transportation related litigation like this case, screening is not an adequate protection of Reading Blue Mountain's interests.

### III.   Question Presented.

The issue raised by the instant motion is whether J&K should be disqualified from continuing to represent Norfolk Southern in this action.

### IV.   Applicable Standards.

In reviewing the conduct of attorneys, and examining the issue of disqualification, federal courts apply the applicable state standards of conduct. *See Dworkin v. General Motors Corp.*, 906 F. Supp. 273, 276-277 (E.D. Pa. 1995). Under Local Rule 83.23.2, the Pennsylvania Rules of Professional Conduct (the "Rules") have been adopted by the Middle District to govern the conduct of attorneys.[1]

In analyzing the effectiveness of screening procedures, once the moving party has demonstrated that a lawyer's former representation exposed the lawyer to confidential client information related to the present dispute, a presumption arises that confidences will be

---

[1]   The Pennsylvania Supreme Court adopted revised Rules as of January 1, 2005.

shared. It is the new firm's burden to establish that the screening it has implemented will be effective to overcome the presumption. *Maritrans GP, Inc. v. Pepper, Hamilton & Scheetz*, 529 Pa. 241, 265, 602 A.2d 1277, 1289 (Pa. 1992) (dissenting opinion). *See also Dworkin, supra.* at 279. Any doubts regarding ethical issues should be resolved in favor of disqualification. *Skowronski v. Teleflex, Inc.*, 1999 U.S. Dist. LEXIS 1961, *8 (E.D. Pa. 1999); *Brennan v. Independence Blue Cross*, 949 F. Supp. 305, 307 (E.D.Pa. 1996).

### V.     Argument.

#### A.     J&K and Mr. Howard should not have entered into negotiations regarding Mr. Howard's employment while he was still representing Reading Blue Mountain.

Rule 1.7 prohibits a lawyer from representing a client if his representation would be materially limited by a personal interest of the lawyer. Comment 10 points out: "[W]hen a lawyer has discussions concerning possible employment with an opponent of the lawyer's client, or with a law firm representing the opponent, *such discussions could materially limit the lawyer's representation of the client.*" (Emphasis added.) As a general matter the *Restatement, 3$^d$, The Law Governing Lawyers* suggests:

> [Section 125] applies when a lawyer seeks to discuss the possibility of the lawyer's future employment with an adversary or an adversary's law firm. The conflict arises whether the discussions about future employment are initiated by the lawyer or by the other side. If discussion of employment has become concrete and the interest in such employment is mutual, the lawyer must promptly inform the client. Without effective client consent ..., the lawyer must terminate all further discussions concerning the employment, or withdraw from representing the client ... .

*Restatement, 3$^d$, The Law Governing Lawyers*, §125, comment d. *See also, ABA/BNA Lawyers' Manual on Professional Conduct*, 51:414-415, and 1001:331-339 (ABA Formal Opinion 96-400). Thus, under Rule 1.7, Mr. Howard should have notified Reading Blue Mountain (and GGE) once

he started negotiating with J&K so that Reading Blue Mountain could protect its interests. Mr. Howard should not have continued to represent Reading Blue Mountain without Reading Blue Mountain's consent; Reading Blue Mountain would not have consented.

J&K knew that its negotiations with opposing counsel would interfere with Reading Blue Mountain's choice of counsel and would interfere with Mr. Howard's continued representation of Reading Blue Mountain. The Preamble to the Rules, paragraph [12] makes it clear that lawyers should aid in securing the observance of the Rules by other lawyers; and Rule 8.4(a) prohibits assisting or inducing another lawyer to violate the Rules. J&K, by advising Mr. Howard of the opening at their firm, and entering into negotiations with Mr. Howard while they knew he was still representing Reading Blue Mountain, ignored these guidelines.

The screening procedures proposed by J&K did not, and cannot provide adequate protection of Reading Blue Mountain's interests in this litigation because they were not implemented when negotiations began. Rather, they were not proposed until after the employment negotiations had taken place, after Mr. Howard had accepted employment with J&K, and only one business day before Mr. Howard began work at J&K.[2] In such circumstances:

> If a lawyer in this situation keeps working on the client's matter
> without revealing the negotiations to the client, the use of a
> screen to insulate the lawyer from the matter once the lawyer
> moves to the new job will probably not prevent the lawyer's new
> firm from being disqualified in the matter.

*ABA/BNA Lawyers' Manual on Professional Conduct* at 51:415 (citations omitted). For these reasons, the Court should not allow the late screening to prevent disqualification of J&K.

---

[2] The adequacy of the screening procedures is discussed below.

### B. The screening proposed by J&K is not adequate in these circumstances to protect the interests of Reading Blue Mountain.

J&K has the burden to demonstrate that the screening it established will be effective to prevent disclosures of confidential client information. If the Court is unable to determine that the screening will be effective, then J&K should be disqualified. In the circumstances of this case it is clear that screening will not be effective.

Rule 1.9(b) prohibits Mr. Howard from representing Norfolk Southern in this litigation (as well as other matters in which he was involved), and any "substantially related" matter with respect to Reading Blue Mountain because Mr. Howard, in the course of his representation of Reading Blue Mountain, clearly acquired confidential client information.[3]

Rule 1.10 acts to impute a new lawyer's knowledge to the other lawyers in his new firm, unless "(1) the disqualified lawyer is screened from any participation in the matter and is apportioned no part of the fee therefrom; and (2) written notice is promptly given to the appropriate client to enable it to ascertain compliance with the provisions of this rule." The purpose of screening is to assure affected parties like Reading Blue Mountain that information known by the disqualified attorney (in this case, Mr. Howard) remains protected. The adequacy of the screening measures depends on the circumstances, and the burden is on the new law firm to demonstrate that the screening procedures it has established are adequate. *Dworkin, supra; Maritrans, supra.* Doubts should be resolved in favor of disqualification. *Skowronski v. Teleflex, Inc.*, 1999 U.S. Dist. LEXIS 1961, *8 (E.D. Pa. 1999); *Brennan v. Independence Blue Cross*, 949 F. Supp. 305, 307 (E.D.Pa. 1996).

---

[3] Mr. Howard is also prohibited from revealing any information related to his representation of a client unless the client consents. This duty continues even after the attorney-client relationship terminates. Rule 1.6(a) and (d).

7

The Comments to the definition of the term "screened" suggest that (1) the disqualified attorney should acknowledge the obligation not to communicate confidential information with other lawyers in his new firm; and (2) other lawyers in the firm working on the matter should be informed that screening is in place. Comment [9]. Depending on the circumstances, written undertakings, denial of access to files and periodic reminders can be appropriate. *Id.* Screening measures must be put in place as soon as practical after the lawyer and law firm know that there is a need for screening. Comment [10].

The requirements of proper screening were examined in some detail in *Dworkin, supra.* In *Dworkin*, an attorney who represented General Motors in a number of lemon law suits over a number of years left his firm and several days later joined a law firm specializing in representing plaintiffs in the same type of lawsuit. The attorney notified GM that he was moving and that he would be screened from any matters involving GM. After noting that the Rules do not provide specific guidance about what is an effective screen, the court went on to consider the following factors:

1. the substantiality of the relationship between the attorney and the former client,
2. the time lapse between the matters in dispute,
3. the size of the firm and the number of disqualified attorneys,
4. the nature of the disqualified attorney's involvement, and
5. the timing of the wall.

*Dworkin*, 906 F. Supp. at 279-280 (citing the dissenting opinion in *Maritrans, supra*). The court also considered whether the screening included the following features:

a. the prohibition of discussion of sensitive matters,
b. restricted circulation of sensitive documents,

      c.      restricted access to files, and

      d.      strong firm policy against breach, including sanctions, physical and/or geographical separation.

*Id.* (citations omitted).

In this case, all of the factors cited by the *Dworkin* court question the effectiveness of any screening in this case – (1) Mr. Howard had a substantial relationship with Reading Blue Mountain; (2) the time lapse between his representation of Reading Blue Mountain and his employment at J&K was immediate; (3) J&K's small size makes it difficult to implement a screen; (4) Mr. Howard was one of the primary attorneys representing Reading Blue Mountain in this litigation; and (5) while the screening may have been implemented by J&K before Mr. Howard began work at J&K, as discussed above, it was not implemented before the negotiations began or before Mr. Howard was offered employment with J&K.

Reading Blue Mountain is particularly concerned about the issue of screening in a small firm. Mr. Howard is located in the same office (no geographic separation) as the principal attorneys of J&K representing Norfolk Southern in this case, and because of the small size, and even smaller number of attorneys doing like kinds of work, Mr. Howard will be working closely with those attorneys on other matters. In *Decora, Inc. v. DW Wallcovering*, 899 F. Supp. 132, 140 (S.D.N.Y. 1995), the court found that there was a substantial possibility of inadvertent disclosures of client confidences in the course of every day professional discussions where the firm was relatively small (44 lawyers), and the disqualified associate and the senior lawyer on the case worked closely together. In this situation J&K has only 9 lawyers, and only 5 of them (including Mr. Howard) do transportation litigation. Mr. Howard cannot help but work closely with Mr. Keenan and Mr. Cohen the two principal attorneys representing Norfolk Southern in this case.

It is true that the court in *Dworkin* approved screening in a case with a small number of attorneys. However, it did so only after finding that the screening was timely implemented, and comprehensive, including that all of the GM files were kept under lock in one senior lawyer's office, the personal computers of the firm's attorneys were not networked, and the senior lawyer reviewed all incoming mail and facsimiles before distribution. *Dworkin*, 906 F. Supp. at 276. Further, the two senior lawyers, after negotiating with the new lawyer, but before an offer was extended, developed a screen and held a meeting of all firm employees at which the ethics screen was implemented and explained. *Id.* Reading Blue Mountain does not believe that J&K will be able to demonstrate that the same types of drastic internal procedures were implemented. Based on the foregoing, the Court should find that any screening procedures that J&K implemented were not sufficient under the circumstances of this litigation.

### C.  As a result of J&K's actions, Reading Blue Mountain is entitled to additional relief.

J&K's hiring of Mr. Howard served to deprive Reading Blue Mountain of its chosen counsel. It will cause Reading Blue Mountain to incur the burden of trying to bring a new lawyer up to speed in a case that has been ongoing for over two years, and in which discovery is already complete. On the other hand, if J&K is not disqualified, neither it nor Norfolk Southern will have been inconvenienced or burdened at all. Equity says this is not the right result. Further, if J&K were not disqualified in a case such as this, firms would get the message that it is a fair tactic to disrupt the representation of your adversary by hiring its attorney in the middle of the case. Additionally, Reading Blue Mountain in order to avoid bringing this motion, asked J&K to voluntarily withdraw from this representation, but it refused to do so. Accordingly, in addition to disqualifying J&K, Reading Blue Mountain requests that the Court award it the costs and attorneys' fees it has incurred in reviewing the disqualification issues and

in pursuing this motion.

**VI.   Conclusion.**

For the reasons set forth above, Janssen & Keenan, P.C. should be disqualified from continuing to represent Norfolk Southern in this action, and Reading Blue Mountain should be awarded its costs and attorneys' fees.

Respectfully submitted,

GOLLATZ, GRIFFIN & EWING, P.C.

Dated:  August 12, 2005

By: _____
Eric M. Hocky, Esquire
PA Attorney I.D. No. 34560
Amy Donohue-Babiak, Esquire
PA Attorney I.D. No. 46892
Four Penn Center, Suite 200
1600 John F. Kennedy Blvd.
Philadelphia, PA 19103
(215) 563-9400

Attorneys for Defendant
Reading Blue Mountain & Northern
Railroad Company